United States District Court
Southern District of Texas

**ENTERED**

March 31, 2022

Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **UVALDO GUZMAN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 2:18-CV-00432** |
| | § | |
| **WARDEN FUENTEZ, WARDEN** | § | |
| **FERNANDEZ, SKINNER C. STURGIS,** | § | |
| **and TOMMY L. WEST** | § | |
| | § | |
| **Defendants.** | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Uvaldo Guzman, a Texas inmate, alleges that prison officers retaliated against him for meeting with an investigator to discuss an assault charge that was pending against him. As a result, Guzman has filed this prisoner civil rights action under 42 U.S.C. § 1983. Pending before the Court is a Motion for Summary Judgment filed by Defendants Skinner Sturgis and Tommy West. (Dkt. No. 50). For the following reasons, the Court **GRANTS** the Motion. This action is **DISMISSED WITH PREJUDICE**.

**I.     PROCEDURAL BACKGROUND**

Guzman is a prisoner in the Texas Department of Criminal Justice (TDCJ), Criminal Institutions Division, and is presently housed at the Bill Clements Unit in Amarillo, Texas. The facts giving rise to Guzman's claims occurred in connection with his previous assignment to the McConnell Unit in Beeville, Texas.

Guzman filed his original *pro se* complaint on November 27, 2018, naming the following defendants: (1) Head Warden Fuentez; (2) Assistant Warden Fernandez;

(3) Lieutenant Skinner C. Sturgis; and (4) Sergeant Tommy L. West.  (Dkt. No. 1 at 1). Guzman generally alleged that the Defendants acted with deliberate indifference to his health and retaliated against him.  (*Id.* at 3-4).  Guzman sought injunctive and monetary relief.  (*Id.* at 4).

On April 2, 2019, following a *Spears* hearing,[1] Magistrate Judge B. Janice Ellington issued a Memorandum and Recommendation ("M&R"), recommending that the Court: (1) dismiss Guzman's claim for money damages against the Defendants in their official capacities as barred by the Eleventh Amendment; (2) dismiss with prejudice all of Guzman's claims against the Defendants for both failure to state a claim and as frivolous under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1); and (3) count the dismissal of this case as a "strike" for purposes of 28 U.S.C. § 1915(g).  (Dkt. No. 12).

On December 20, 2019, Judge Hilda G. Tagle adopted in part and declined to adopt in part the M&R.  (Dkt. No. 15).  The Court adopted the M&R to the extent that it dismissed Guzman's claims for money damages against the Defendants in their official capacities and Guzman's claims against supervisory officials.  (Dkt. No. 15 at 9).  Contrary to the M&R, the Court retained Guzman's deliberate indifference and retaliation claims against Lt. Sturgis and Sgt. West.  (*Id.*).  Magistrate Judge Julie K. Hampton ordered service of Guzman's complaint on Sturgis and West (collectively "the Defendants"). (Dkt. No. 19).

---

[1]    A *Spears* hearing is "an evidentiary hearing 'in the nature of a motion for more definite statement.'"  *Spears v. McCotter*, 766 F.2d 179, 181–82 (5th Cir. 1985).

On December 21, 2020, the Court appointed Emily Carra Miller to represent Guzman.  (Dkt. No. 31).  On April 6, 2021, through appointed counsel, Guzman filed a Second Amended Complaint in which he asserts the same claims of deliberate indifference and retaliation against the Defendants.  (Dkt. No. 38).  The Defendants subsequently filed their Amended Answer.  (Dkt. No. 39).  The Defendants filed a Motion for Summary Judgment (Dkt. No. 50), to which Guzman responded.  (Dkt. No. 51).

## II.    SUMMARY JUDGMENT EVIDENCE

### A.    GUZMAN'S *SPEARS* HEARING AND DEPOSITION TESTIMONY

Guzman provided the following testimony at his *Spears* hearing and in his deposition. Guzman was in his late 60s at the time of the events occurring on May 23, 2018.  (Dkt. No. 50-1 at 10).  Before then, Guzman was placed in administrative segregation at the McConnell Unit after being charged with assaulting a TDCJ officer at another prison unit.  (Dkt. No. 50-1 at 12); (Dkt. No. 51-1 at 10, 21).  While the Defendants knew why Guzman was placed in administrative segregation, Guzman had never spoken with either Sturgis or West before May 23, 2018.  (Dkt. No. 50-1 at 50–51, 92).

Sometime between 7:30 and 8:00 a.m. on May 23, 2018, Guzman was removed from his cell to meet with his attorney's investigator to discuss the pending assault charge. (Dkt. No. 50-1 at 24); (Dkt. No. 51-1 at 3).  Guzman initially met the investigator in a small conference room, with a table that had a plexiglass partition and a small hole for the parties to speak to each other.  (Dkt. No. 51-1 at 11).

Because Guzman and the investigator were hard of hearing, a prison official moved Guzman to a room containing several holding cages, also referred to as

"shakedown cages."  (Dkt. No. 50-1 at 26); (Dkt. No. 51-1 at 5, 11).  At around 8:30 a.m., Sturgis locked Guzman inside a shakedown cage.  (Dkt. No. 50-1 at 26–27); (Dkt. No. 51-1 at 12–13).  A shakedown cage is approximately seven feet high, and the floor space is three feet wide and two-to-three feet long.  (Dkt. No. 50-1 at 28); (Dkt. No. 51-1 at 3–4).  The cage in which Guzman was locked contained one place to sit, with mesh wire along the outside allowing the occupant to see through and communicate with people on the outside.  (*Id.* at 5–6).  The cage contained no running water and no toilet.  (*Id.*).

Only one door leads into the room containing the shakedown cages, and there were no cameras inside the room.  (*Id.* at 7–8).  A camera in the hallway oversaw the door leading into the room.  (*Id.* at 8).  The shakedown cage had one door, which was locked.  (*Id.* at 7).

The investigator remained outside the cage while he spoke with Guzman.  (*Id.* at 5–6).  When Guzman met with the investigator, the door to the room was open.  (*Id.* at 9).  The meeting with his investigator took around 40 to 45 minutes, after which the investigator left through the open door.  (Dkt. No. 50-1 at 30–31); (Dkt. No. 51-1 at 9–10, 12).  Guzman testified that to be removed from the shakedown cage and returned to his cell, prison policy required him to be placed in handcuffs and escorted by two officers.  (Dkt. No. 50-1 at 97).

Guzman remained locked in the shakedown cage after the investigator left.  (Dkt. No. 51-1 at 12).  Sturgis entered the room after two hours had passed.  (Dkt. No. 50-1 at 32); (Dkt. No. 51-1 at 12).  Sturgis expressed his surprise that Guzman was still in the shakedown cage.  (Dkt. 50-1 at 32).  Sturgis further informed Guzman that the

investigator had failed to inform him that the meeting was completed.  (*Id.*); (Dkt. No. 51-1 at 12).  Guzman informed Sturgis that the meeting was completed and that he wanted to return to his cell.  (Dkt. 50-1 at 32); (Dkt. No. 51-1 at 12).  Sturgis responded that he would be right back to take Guzman to his cell.  (Dkt. 50-1 at 32); (Dkt. No. 51-1 at 13).

Approximately an hour later, Sturgis and West entered the room.  (Dkt. No. 50-1 at 33).  Sturgis asked Guzman "You still here?"  (*Id.*).  Guzman was again told that Sturgis and West would be right back to get Guzman out of the holding cell.  (*Id.*).  After another hour or two hours passed, West entered the room expressing surprise that Guzman remained in the shakedown cage.  (*Id.* at 33–34).  West told Guzman that he would be right back to get Guzman out of the cage.  (*Id.* at 34).  Guzman did not see West again that day.  (*Id.* at 37).

At some point later in the day, Sturgis entered the room with another officer.  (*Id.* at 36–37).  Sturgis again told Guzman he would come back and get Guzman out.  (*Id.* at 37).  Sturgis later came into the room on another occasion with a food tray for someone else.  (*Id.* at 37–38).

On those visits, Guzman testified at the *Spears* hearing:

> Then [Sturgis] came back again a couple of times.  And one time, he come in there and was kind of like making fun of me. He said, I got you w[h]ere I want you.  You're going to stay in there.  Just don't go nowhere.  I'll come get you in a little while.  Said, you just don't go nowhere, he kept telling me.

(Dkt. No. 51-1 at 13).  Guzman testified in a subsequent deposition that Sturgis never threatened him or called Guzman any names during his visits to the room.  (Dkt. No. 50-

1 at 38, 72).  Guzman estimated that he saw Sturgis a total of four or five times on February

23, 2018.  (*Id.* at 37).

A female officer stuck her head in the room on one occasion and saw Guzman in

the shakedown cage.  (*Id.* at 38).  According to Guzman, the female officer left after

laughing or smiling.  (*Id.*).  Guzman did not complain to the Defendants or the female

officer during the day about his placement in the shakedown cage.  (*Id.* at 39).

Guzman was aware that people were walking by the door to the room in which

he was confined.  (Dkt. No. 51-1 at 13–14).  However, he did not yell out to anyone passing

by in the hallway.  (Dkt. No. 50-1 at 39).  The door remained open until a shift change that

occurred around 6:00 p.m.  (Dkt. No. 51-1 at 14–15).  Around that time, an inmate walking

down the hallway closed the door.  (*Id.* at 14).

Guzman became hungry and thirsty during his time in the shakedown cage, (Dkt.

No. 50-1 at 63), but he was never offered water or food by Sturgis or West.  (Dkt. No. 51-

1 at 15).  Further, Guzman had no access to bathroom facilities.  (*Id.* at 16).  During his

stay in the cage, Guzman defecated and urinated on himself on several occasions.  (Dkt.

No. 50-1 at 61–62); (Dkt. No. 51-1 at 19–20).  After the shift change, Guzman did not see

anyone again until he was released from the cage.  (Dkt. No. 51-1 at 15).  After the 6:00

p.m. shift change, Guzman fell asleep several times on the stool in the shakedown cage.

(Dkt. No. 50-1 at 40–42).

Guzman was ultimately released from the cage at 4:00 a.m. the next morning,

which meant that he spent approximately nineteen hours in the cage.  (Dkt. No. 51-1 at

20).  Guzman missed three meals while he was confined in the shakedown cage.  (*Id.* at

24).  Guzman testified that he felt fine physically when he was released and that "[t]here wasn't nothing wrong with me."  (*Id.*); (Dkt. No. 50-1 at 60–62).  He was immediately taken to the infirmary where he was given water to drink for possible dehydration.  (Dkt. No. 50-1 at 45); (Dkt. No. 51-1 at 24).  Guzman did not eat anything until he was returned to his cell.  (Dkt. No. 50-1 at 45).

Guzman could not say that be believed he was left in the shakedown cage for hours because he chose to meet with an investigator who was assisting in his defense against a charge of assaulting a TDCJ officer.  (*Id.* at 76–77, 80).  Guzman stated that it "was wrong and they kn[e]w it was wrong."  (*Id.* at 76).  He later acknowledged that the Defendants' action may have been motivated in response to Guzman's actions in connection with his assault charge.  (*Id.* at 82).

### B.   STURGIS'S DEPOSITION TESTIMONY

Sturgis provided the following deposition testimony.  Sturgis was employed by the TDCJ as a lieutenant at the McConnell Unit.  (Dkt. No. 50-5 at 14-16, 59).  Sturgis was assigned to Building 12 of the McConnell Unit, which houses inmates like Guzman in restrictive housing (the current term used for administrative segregation).  (*Id.* at 60).  Sturgis estimated that, at any given time, between 440 and 500 inmates were housed in Building 12.  (*Id.*).  Before May 23, 2018, Sturgis did not know Guzman and did not know why he was housed in administrative segregation.  (*Id.* at 59, 64).

Sturgis's shift started at 6:00 a.m. on that day.  (*Id.* at 66).  Sturgis was West's immediate supervisor.  (*Id.* at 69).  Sturgis recalls that May 23, 2018 was a "crazy busy"

day and that it was unusual for an inmate to be placed in a shakedown cage.  (*Id.* at 64-65).

Sturgis testified that a holding cell is the same thing as a shakedown cage.  (*Id.* at 59).  Shakedown cages were not designed to house inmates for a long period of time.  (*Id.* at 107).  Typically, either Sturgis or West would ask for authorization to place an inmate in a shakedown cage.  (*Id.* at 122, 127).  Sturgis stated that he did not place Guzman in the shakedown cage on May 23, 2018.  (*Id.* at 122).

Sturgis recalled seeing Guzman several times that day.  The first time Sturgis saw Guzman was when he was in the legal booth before the meeting with the investigator. (*Id.* at 74).  The second time, which happened before lunch, Sturgis recognized that the door to the room containing the shakedown cages was open and the light was turned on. (*Id.* at 73, 75).  Sturgis asked Guzman if the meeting with his investigator had concluded, to which Guzman responded that it had.  (*Id.* at 73).

Sturgis ordered that Guzman be removed from the shakedown cage.  (*Id.* at 76–77).  In addition to West, Sturgis told at least two other officials that Guzman was in the shakedown cage.  (*Id.* at 96).  He also yelled at other officers walking up and down the hallway about getting Guzman escorted from the shakedown cage.  (*Id.*).  Sturgis testified that, because of Guzman's custody level, at least two members of the security staff were required to move Guzman from the shakedown cage to his housing area.  (*Id.* at 120, 128).

While Guzman was in the shakedown cage, Sturgis was busy attending to other matters and incidents in Building 12.  (*Id.* at 76).  In between responding to these other matters which required the presence of other staff members, Sturgis checked to see

whether Guzman had been moved from the shakedown cage. (*Id.* at 76-77). During the times that he checked on Guzman, Sturgis recalled Guzman as having a calm demeanor in general but aggravated that the removal from the shakedown cage was not happening as quickly as hoped. (*Id.* at 78, 81).

Sturgis could not recall when he left work on May 23, 2018. (*Id.* at 87). He generally left work around 7:30 to 8:00 p.m. (*Id.* at 87). Before leaving for home on May 23, 2018, Sturgis walked past the room containing the shakedown cages and saw that the door was locked and the lights were off. (*Id.* at 91). Typically, doors are left open to rooms when an inmate is inside. (Dkt. No. 50-6 at 38). Therefore, Sturgis assumed that Guzman had been removed from that holding area and taken back to his assigned cell. (Dkt. No. 50-5 at 91).

The next morning, however, the unit's nightshift supervisors informed Sturgis that Guzman had not been removed from the shakedown cage at the time he finished his shift. (*Id.* at 89, 125). Sturgis later learned that Guzman had urinated and defecated on himself while confined in the shakedown cage. (*Id.* at 92-93).

Sturgis estimated that Guzman spent 12 hours in the shakedown cage. (*Id.* at 94). Sturgis characterized this as abnormal. (*Id.* at 109). Sturgis reiterated that, while he wanted Guzman "placed back into his assigned cell where he belonged," he was not concerned that Guzman would be injured in the cage. (I*d.* at 124).

### C.   SGT. WEST'S DEPOSITION TESTIMONY

West provided the following deposition testimony. West was employed by the TDCJ as a sergeant at the McConnell Unit and was assigned to Building 12 of the

McConnell Unit.  (Dkt. No. 50-6 at 13, 18).  Before May 23, 2018, West did not know Guzman.  (*Id*. at 30).  West also testified that because Guzman was housed in administrative segregation, two members of the security staff were required to move him outside the housing area.  (*Id*. at 74).

West's shift on May 23, 2018 started at 6:00 a.m.  (*Id*. at 31).  West did not recall asking anyone for permission to place Guzman in a shakedown cage that day or actually placing Guzman in a shakedown cage.  (*Id*. at 36).  West further did not recall walking past an open door containing shakedown cages in May 2018.  (*Id*. at 38).  West was also not aware that Guzman had been locked in a shakedown cage that day.  (*Id*.).  West stated that he could not recall any details from May 23, 2018 with regard to Guzman's time spent in a shakedown cage.  (*Id*. at 44, 72-73).

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2512.

In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors*

10

*Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence or evaluate the credibility of witnesses.  *Id.*  Furthermore, affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated."  Fed. R. Civ. P. 56(c)(4); *Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).  Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  If the moving party does so, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings.  Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted."  *Caboni*, 278 F.3d at 451.  "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed."  *Anderson*, 477 U.S. at 250-51, 106 S.Ct. at 2511.

## IV.    DISCUSSION

### A.    COMPENSATORY DAMAGES

The Prisoner Litigation Reform Act (PLRA) precludes an action by a prisoner for compensatory damages "for mental or emotional injury suffered while in custody without a prior showing of physical injury[.]"  42 U.S.C. § 1997e(e).  The Defendants contend that Guzman's claims seeking compensatory damages should be dismissed for failure to comply with the physical injury requirements of the PLRA.  (Dkt. No. 50 at 13-15).  Guzman concedes that compensatory damages are unavailable to him because he has not alleged physical injury.  (Dkt. No. 51 at 5).  Accordingly, the Defendants' summary judgment motion is granted with regard to Guzman's compensatory damages claims.

Guzman stated in his response to the summary judgment motion that he reserved the right to seek nominal and punitive damages at trial.  (*Id*.).  While specifying that he sought punitive damages, Guzman did not specifically seek nominal damages in the Second Amended Complaint.  *See* (Dkt. No. 38 at 8).  So, his request for nominal damages is not properly before the Court.  Regardless, while a prisoner may recover punitive damages under Section 1938 for a constitutional violation, *Hutchins v McDaniels*, 512 F.3d 193, 198 (5th Cir. 2005), he can only do so if he can overcome a defense of qualified immunity.  *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994); *see also Hutchins v McDaniels*, 512 F.3d 193, 198 (5th Cir. 2005); *Anderson v. Black*, No. 6:17cv672, 2018 WL 3453485, at *5 (E.D. Tex. June 26, 2018); *Spencer v. August*, No. 1:16-CV-33, 2017 WL 1739175, at *3 (Feb. 28, 2017).

### B.    QUALIFIED IMMUNITY

The Defendants contend that they are entitled to qualified immunity with respect to Guzman's retaliation and deliberate indifference claims.  (Dkt. No. 50 at 15–27). Indeed, government officials performing discretionary duties may respond to Section 1983 claims by asserting a qualified immunity defense.  *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (citing *Haverda v. Hays Cty.*, 723 F.3d 586, 598 (5th Cir. 2013)).

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *White v. Pauly*, ____ U.S. ____, ____, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam).  Government officials are given "breathing room to make reasonable but mistaken judgments," and "all but the plainly incompetent or those who knowingly violate the law" are protected.  *Stanton v. Sims*, 571 U.S. 3, 6, 134 S.Ct. 3, 5, 187 L.Ed.2d 341 (2013) (per curiam) (citations omitted).  Qualified immunity "represents the norm, and courts should deny a defendant immunity only in rare circumstances."  *Rich*, 920 F.3d at 294; *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) ("[Courts] must think twice before denying qualified immunity.").

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense.  *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005).  When a government official has pleaded the defense of qualified immunity alleging the actions taken were in good faith and within the scope of discretionary authority, the burden is on the plaintiff to establish the official's conduct violated clearly established law.  *Id.* Guzman cannot rest on the pleadings but instead must show a genuine issue of material

fact concerning the reasonableness of the official's conduct.  *Id.*; *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489-90 (5th Cir. 2001).

To survive summary judgment on the issue of qualified immunity, a plaintiff must satisfy two independent inquiries.  First, whether viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendants violated the plaintiff's constitutional rights.  *Freeman v. Gore,* 483 F.3d 404, 410 (5th Cir. 2007); *Delaughter v. Woodall*, 909 F.3d 130, 137-38 (5th Cir. 2018).   If the Court determines that "the alleged conduct did not violate a constitutional right, [the] inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity."  *Lytle v. Bexar County,* 560 F.3d 404, 410 (5th Cir. 2009) (citation omitted).

Second, if there is a genuine dispute of material fact regarding whether there was a constitutional violation, the Court asks whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the constitutional violation.  *Freeman,* 483 F.3d at 411.  Courts are permitted to exercise discretion in determining the order to analyze the two-part qualified immunity test.  *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020).

### 1.    <u>Retaliation</u>

Retaliation is not expressly referenced in the Constitution; however, it is nonetheless actionable because retaliatory actions may chill an individual's exercise of constitutional rights.  *See Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).  "Retaliation against a prisoner is actionable only if it 'is capable of deterring a person of ordinary firmness from further exercising his constitutional rights.'"

*Bibbs v. Early*, 541 F.3d 267, 270 (5th Cir. 2008) (quoting *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006)).

"[A] prison official may not retaliate against or harass an inmate for exercising the right of access to the courts, or for complaining to a supervisor about a guard's misconduct." *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995). "Filing grievances and otherwise complaining about the conduct of correctional officers through proper channels are constitutionally protected activities, and prison officials may not retaliate against inmates for engaging in such protected activities." *Reese v. Skinner*, 322 F. App'x 381, 383 (5th Cir. 2009) (citing *Morris*, 449 F.3d at 684).

The Fifth Circuit has emphasized that "[p]risoners' claims of retaliation are regarded with skepticism and are carefully scrutinized by the courts." *Adeleke v. Fleckenstein*, 385 F. App'x 386, 387 (5th Cir. 2010) (per curiam) (citing *Woods*, 60 F.3d at 1166). In addition, the Fifth Circuit has held that some acts, even though they may be motivated by retaliatory intent, are "so *de minimis* that they would not deter the ordinary person from further exercise of his rights." *Morris*, 449 F.3d at 686. Such acts do not rise to the level of constitutional violations and cannot form the basis of a Section 1983 claim. *Id.*

To state a Section 1983 claim for retaliation, "a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Jones v. Greninger*, 188 F.3d 322, 324–25 (5th Cir. 1999) (citing *McDonald v. Stewart*, 132 F.3d 225, 231 (5th Cir. 1998)). An inmate must allege more than his personal belief that he is the

victim of retaliation. *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997).   Mere conclusory allegations of retaliation will not withstand summary judgment. *Woods*, 60 F.3d at 1166.   The inmate must produce direct evidence of motivation or a chronology of events from which retaliation may plausibly be inferred. *Id.*  On the element of causation, a successful claim of retaliation requires a showing that, but for some retaliatory motive, the complained of adverse incident would not have occurred. *Id.*

The Defendants contend that they did not intend to retaliate against Guzman after he met with his attorney's investigator and never intended for Guzman to remain in the shakedown cage as long as he did.  (Dkt. No. 50 at 18–19).  They further contend that Guzman's visit with his attorney's investigator was not the reason Guzman was left in the shakedown cage.  (*Id.* at 19–20).  Rather, according to the Defendants, Guzman's lengthy stay in the shakedown cage was due to them attending to other issues that day. (*Id.* at 20).

Guzman responds that he had a Sixth Amendment right to counsel in his criminal proceeding where he was charged with assaulting a TDCJ officer at another prison unit. (Dkt. No. 51 at 6–7).  Guzman contends that the Court has already found sufficient retaliatory intent and causation based on his *Spears* hearing testimony that Defendants were aware he was in the cage and taunted him while he was there.  (*Id.* at 7).

"The invocation of a specific constitutional right is the first element of a retaliation claim." *Williams v. Sellers*, No. 4:11-CV-4287, 2014 WL 794191, at *11 (S.D. Tex. Feb. 26, 2014).  The Parties agree that Guzman has invoked a specific constitutional right—his Sixth Amendment right to counsel in his criminal prosecution.  (Dkt. No. 50 at 18); (Dkt.

No. 51 at 7). After all, it is undisputed that, on May 23, 2018, Guzman met with his attorney's investigator to discuss the charge of assaulting a TDCJ officer at another prison unit. And the Defendants raise no arguments contesting whether Guzman can satisfy the third element of his retaliation claim. Rather, the Defendants specifically challenge whether Guzman can meet the second element (retaliatory intent) and the fourth element (causation) of his retaliation claims.

First, retaliatory intent. The Defendants' uncontroverted testimony shows that they had no meaningful interactions with Guzman before May 23, 2018. (Dkt. No. 50-5 at 59); (Dkt. No. 50-6 at 30). But Guzman and the Defendants dispute whether the Defendants knew why Guzman had been placed in administrative segregation, (Dkt. No. 50-5 at 64), and whether Sturgis initially placed Guzman in the shakedown cage. (Dkt. No. 50-1 at 29); (Dkt. No. 51-1 at 7, 12–13); (Dkt. No. 50-6 at 30–31). No evidence has been presented, however, to show that Defendants *intended* for Guzman to stay in the shakedown cage for as long as he did or that they had any retaliatory animus in keeping him in the cage. At various times throughout their dayshift on May 23, 2018, Sturgis communicated to Guzman that he would arrange to have him removed from the shakedown cage. (Dkt. 50-1 at 32–33, 37); (Dkt. No. 51-1 at 13). When West visited Guzman on one occasion, he also informed Guzman that he would help in getting him out of the shakedown cage. (Dkt. No. 50-1 at 34). The uncontroverted summary judgment evidence further shows that: (1) after seeing Guzman in the cage before lunch and after his meeting with his investigator, Sturgis delegated the task of removing Guzman from the cage to other officers, (Dkt. No. 50-5 at 76, 96); (2) Sturgis delegated this

17

task to other officers because he and West were busy attending to other issues that constantly arose in Building 12 on May 23, 2018,  (*Id.* at 76*); and (3) in between attending to other matters in Building 12, Sturgis continually attempted throughout the day to find able-bodied officers to escort Guzman from the shakedown cage, (*Id.* at 96).

Guzman contends that a genuine issue of a disputed material fact exists regarding the Defendants' intent to retaliate because they knew he was placed in the cage following his meeting with his attorney's investigator and yet taunted him while he was confined in the cage.  (Dkt. No. 51 at 7).  Guzman cites to his *Spears* hearing testimony where he stated that Sturgis teased him on one of his visits saying that he was going to stay in the cage and that Sturgis had Guzman right where he wanted him.  (Dkt No. 51-1 at 13). Guzman's testimony, however, does not indicate that Sturgis taunted him for visiting with his attorney's investigator earlier that morning.  Consistent with the Defendants' other visits to Guzman throughout the day, Sturgis communicated that he would "get [Guzman] in a little while" from the cage.  (Dkt. No. 51-1 at 13).  Guzman clarified in his deposition testimony that Sturgis never threatened him or called Guzman any names during his multiple visits to the room.  (Dkt. No. 50-1 at 38, 72).

Finally, the uncontroverted summary judgment evidence demonstrates that by the end of his shift on May 23, 2018, Sturgis believed Guzman had been removed from the shakedown cage because he saw that the lights to the room had been turned off, which meant that the door was locked.  (Dkt. No. 50-5 at 91).  Rather than showing retaliatory intent on the part of Sturgis, the summary judgment evidence shows that Sturgis engaged in efforts throughout the day, albeit unsuccessfully, to have Guzman removed from the

shakedown cage.  Guzman otherwise fails to present any evidence showing that West, as one of Sturgis' subordinates, had the requisite retaliatory intent to leave Guzman stranded alone in the shakedown cage for hours.

Guzman also has presented no competent summary judgment evidence establishing the element of causation, which requires a showing that "but for the retaliatory motive the complained of incident  would not have occurred." *Johnson*, 110 F.3d at 310 (citation and alteration omitted).  Indeed, the summary judgment evidence shows at best only a close temporal proximity between Guzman's meeting with his attorney's investigator and his subsequently being left in the shakedown cage.  Such temporal proximity alone is insufficient to establish "but for" causation in a prisoner retaliation claim.  *Reese v. Skinner*, 322 F. App'x 381, 383 (5th Cir 2009) (per curiam) (holding that temporal proximity alone is insufficient to establish but for causation in a Title VII retaliation claim); *see also Young v. Polk*, No. 5:20cv87, 2021 WL 5988428, at *8 (E.D. Tex. Sep. 23, 2021) (citing  *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) and *Tampa Times Co. v. National Labor Relations Board*, 193 F.2d 582, 583 (5th Cir. 1952)) (recognizing "the mere fact that one incident precedes another is not proof of causal connection because this is a logical fallacy of *post hoc ergo propter hoc* (after this, therefore because of this)").

Rather than resulting from Defendants' retaliatory intent, the summary judgment evidence shows that Guzman's time in the cage was caused by Defendants' attention to other matters occurring at Building 12 that day and the inability to successfully coordinate Guzman's escort out of the cage.  Guzman's deposition testimony reflects only

19

his belief that Defendants' actions in connection with his lengthy stay in the cage may have been motivated in response to Guzman's meeting with his attorney's investigator in connection with his assault charge.  (Dkt. No. 50-1 at 82).  Guzman stated that he "can't say the reason why" they left him in a cage, (*Id.* at 99–100), beyond anything more than a guess, but that the meeting with his investigator "brought about the opportunity for them to do it."  (*Id.* at 76).  Guzman's testimony fails to demonstrate anything more than his subjective belief he was the victim of retaliation on that day.

In sum, the competent summary judgment evidence fails to establish either Defendants' intent to retaliate or the requisite causation.  Thus, when viewing the competent summary judgment in a light most favorable to Guzman, there is no genuine issue of material fact as to whether Guzman can demonstrate a retaliation claim against either Sturgis or West.  Because Guzman has failed to state any retaliation claims against Defendants, it is unnecessary to examine whether Defendants' actions were objectively reasonable.  *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).  Thus, the Defendants are entitled to qualified immunity as well as summary judgment with respect to Guzman's retaliation claims.

## 2.    Deliberate Indifference

The Eighth Amendment prohibits cruel and unusual punishment.  U.S. Const. amend. VIII.  "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999) (quoting *Woods*

*v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (per curiam) (alterations omitted)). Prison officials are required to provide humane conditions of confinement and ensure that inmates receive adequate food, water, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed. 2d 811 (1994); *Flores v. TDCJ Transitorial Planning Dept.*, No. 2:14-CV-283, 2015 WL 10436114, at *2 (S.D. Tex. Nov. 17, 2015).

An Eighth Amendment violation occurs when a prison official is deliberately indifferent to an inmate's health or safety. *Farmer* at 834, 114 S.Ct. at 1977. The test for deliberate indifference has both an objective and subjective prong. *Id.* at 839, 114 S.Ct at 1980. Under the objective prong, the inmate "must first prove objective exposure to a substantial risk of serious harm." *Trevino v. Livingston*, No. 3:14-CV-52, 2017 WL 1013089, at *3 (S.D. Tex. Mar. 13, 2017) (citing *Gobert v. Caldwell*, 463 F.3d 339, 345-46 (5th Cir. 2006)). To prove the subjective prong of the deliberate indifference test, the inmate "must establish that the defendants were aware of an excessive [or substantial] risk to the plaintiff's health or safety, and yet consciously disregarded the risk." *Cook v. Crow*, No. 1:20-CV-85, 2021 WL 6206795, at *3 (E.D. Tex. July 26, 2021) (citing *Farmer*, 511 U.S. at 397 and *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002)).

"Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001). The Fifth Circuit has "consistently recognized . . . that 'deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.'" *Dyer*, 964 F.3d at 381 (quoting *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 458-59 (5th Cir.

2001)); *see also Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021) ("Negligence or even gross negligence is not enough, the officials must have actual knowledge of the substantial risk").  The Supreme Court further explains that "an official's failure to alleviate a significant risk that he should have perceived but did not" falls short of constituting deliberate indifference.  *Farmer*, 511 U.S. at 838, 114 S.Ct. at 1979.

The Defendants concede that the objective prong of the deliberate indifference standard has been met because the evidence establishes that Guzman's extended stay in the shakedown cage exposed him to a substantial risk of serious harm.  (Dkt. No. 50 at 22).  But the Defendants maintain that Guzman cannot satisfy the subjective prong of the deliberate indifference test.  (*Id.*).  They argue that the summary judgment evidence does not show that either Sturgis or West was "aware of facts giving rise to a substantial risk of harm, actually drew such an inference, or disregarded that risk."  (Dkt. No. 50 at 22).  Guzman responds that Defendants were aware of his nineteen-hour confinement in a small shakedown cage without access to food, water, or a toilet and that they disregarded the substantial risk of harm to Guzman.  (Dkt. No. 51 at 10).  Guzman contends that, at a minimum, genuine issues of disputed material fact exist to preclude summary judgment on his deliberate indifference claims.  (Dkt. No. 51 at 10-11).  The Court agrees with the Defendants.

The undisputed summary judgment evidence establishes that: (1) during Guzman's meeting with his attorney's investigator, Guzman was placed in a confined shakedown cage, (Dkt. No. 50-1 at 26–27); (2) Guzman did not have access to a bathroom while in the cage, (*Id.* at 61–62); (3) Guzman was not offered food or water while in the

cage, (Dkt. No. 51-1 at 15–16); (4) Guzman urinated and defecated on himself while in the cage, (Dkt. No. 50-1 at 61–62); and (5) Guzman was confined in the cage for a minimum of twelve hours, (Dkt. No. 50-5 at 94), and possibly as long as nineteen hours, (Dkt. No. 51-1 at 19–20).  But while it is uncontested that Guzman was denied "the minimum civilized measure of life's necessities" during his stay in the cage, Guzman has failed to present evidence showing that Defendants *knew of* and *disregarded* a substantial or excessive risk to his health.

Sturgis provided uncontroverted testimony that he wanted Guzman "placed back into his assigned cell where he belonged," and that he was not concerned about Guzman being injured in the cage.  (Dkt. No. 50-5 at 124).  West also stated that he did not believe an inmate would get injured after being left in the cage.  (Dkt. No. 50-6 at 73–74).  It is further uncontroverted that, during the time that Guzman was confined in the shakedown cage, he did not complain or call out to the Defendants or otherwise indicate that he was injured.  (Dkt. No. 50-1 at 39).  No evidence was presented to indicate that either Sturgis or West had knowledge that Guzman either urinated or defecated on himself.

The uncontroverted summary judgment evidence shows that Defendants checked on Guzman periodically throughout the day while he was in the shakedown cage and that each Defendant communicated their intent to have him removed.  (Dkt. No. 50-1 at 32–37); (Dkt. 50-5 at 73–77); (Dkt. No. 51-1 at 12–13).  Even on the one occasion Guzman believes Sturgis was making fun of him, Sturgis nonetheless informed Guzman that he would come get him in a little while.  (Dkt No. 51-1 at 13).

Sturgis also delegated the task of removing Guzman from the cage to other officers because he and West were busy attending to other issues that constantly arose in Building 12 that day.  (Dkt. No. 50-5 at 76–77, 96).  And Sturgis believed Guzman had been removed from the shakedown cage.  (Dkt. No. 50-5 at 91).  The actions of the Defendants do not amount to deliberate indifference.  The failure to remove Guzman from the cage reflects at most inept, ineffective, or negligent conduct, for which an inmate may not recover under a deliberate indifference claim.  *See Alton v. Texas A&M University*, 168 F.3d 196, 201 (5th Cir. 1999) ("Actions and decisions that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference").

When viewing the competent summary judgment in a light most favorable to Guzman, no genuine issues of material fact exist as to whether Sturgis or West were aware of facts giving rise to a substantial risk of harm to Guzman, actually drew such an inference, and then disregarded that risk to his health.  At best, the actions of the Defendants amount to a negligent response to a substantial risk of serious harm to Guzman.  *See Dyer*, 964 F.3d at 381.  Because Guzman has failed to state deliberate indifference claims against the Defendants, it is unnecessary to examine whether their actions were objectively reasonable. *See Pearson*, 555 U.S. at 236, 129 S.Ct. at 818. Thus, the Defendants are entitled to qualified immunity and summary judgment with respect to Guzman's deliberate indifference claims.

## V.     CONCLUSION

Based on the foregoing, the Court **GRANTS** the Defendants' Motion for Summary Judgment.     (Dkt. No. 50).     The Court **DISMISSES WITH PREJUDICE** Guzman's retaliation and deliberate indifference claims.

It is SO ORDERED.

Signed on March 31, 2022.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**

25